```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
```

```
ATLANTIC CAPE FISHERIES,
INC.,                              HON. JEROME B. SIMANDLE

              Plaintiff,           Civil Action No. 07-4892

     v.
                                   OPINION
F/V BETH & LISA, et al.,

              Defendants.
```

APPEARANCES:

Stephen William Barry, Esq.
ROSSI, BARRY, CORRADO & GRASSI, PC
2700 Pacific Avenue
Wildwood, NJ 08260
     Attorney for Plaintiff Atlantic Cape Fisheries, Inc.

Edward V. Cattell, Jr., Esq.
HOLLSTEIN, KEATING, CATTELL, JOHNSON & GOLDSTEIN, PC
Willow Ridge Executive Office Park
750 Route 73 South
Suite 301
Marlton, NJ 08053
     Attorney for Claimant Shamrock Marine Towing & Salvage

Ronald M. Macfarland, Esq.
P.O. Box 542
1778 Rt. 47
Woodbine, NJ 08270
     Attorney for Claimant Sea Gear Marine Supply, Inc.

James H. Pickering, Esq.
457 Kings Highway
South Seaville, NJ 08246-0600
     Attorney for Claimant Paul Lemieux

**SIMANDLE**, District Judge:

     In connection with the confirmation hearing on the sale of

the fishing vessel *Beth & Lisa* that is the subject of this

lawsuit, the Court must determine the priority of the liens on the vessel held by Plaintiff Atlantic Cape Fisheries ("ACF") and Defendant Shamrock Marine Towing & Salvage ("Shamrock"). The principal issues addressed are whether the services rendered by Shamrock qualify for first priority status as a salvage lien, and, if so, whether Shamrock's salvage lien claim is barred by the two-year statute of limitations in 46 U.S.C. § 80107. For the reasons explained below, the Court finds that while Shamrock provided salvage services to ACF, its claim is barred by the statute of limitations. Accordingly, ACF, which holds the Preferred Ship Mortgage upon the *F/V Beth & Lisa*, enjoys first priority, to be paid from proceeds of the sale of the vessel which occurred on April 4, 2008.

I.  **BACKGROUND**

   A.  **ACF's Mortgage Lien**

The parties largely agree on the facts at issue in this matter. The *F/V Beth & Lisa* is an eighty-nine-foot fishing vessel. (Compl. ¶ 3.) On April 25, 2000, South Coast Fisheries ("SCF"), which then owned the *Beth & Lisa*, entered into a mortgage agreement with Summit Bank under which Summit Bank extended SCF credit in the amount of $260,000.00, in consideration for which SCF granted Summit Bank a security interest in the form of a first priority ship's mortgage lien on the *Beth & Lisa*. (Id. at ¶¶ 7-8.) The mortgage was recorded and

2

filed with the United States Coast Guard National Vessel Documentation Center (the "NVDC") on May 22, 2001.  (Id. at ¶ 9.) On March 3, 2005, SCF ceased making timely payments in accordance with the terms of its mortgage.  (Id. at ¶ 13.)  The parties appear to agree that SCF was in default since that date and did not cure its default.  (Id.)

On November 15, 2005, Bank of America, the successor in interest to Summit Bank's rights under the mortgage agreement, assigned its security interest in the B&L to Great Plains Capital Corporation ("Great Plains").  (Id. at ¶ 11.)  This assignment was recorded and filed with the NVDC on January 20, 2006.  (Id.) Great Plains subsequently assigned its rights under the note and its security interest in the *Beth & Lisa* to Plaintiff on May 31, 2007.  (Id. at ¶ 12.)  According to the Complaint, as of June 8, 2007, SCF owed Plaintiff $15,839.70 in unpaid principal, $12,660.20 in unpaid interest, and $7,980.41 in unpaid costs and attorneys' fees.  (Id. at ¶ 14.)  Taking into account the additional costs, fees, expenses, and interest that have accrued since June 8, 2007, Plaintiff's attorney certifies that the total expenses and costs due to Plaintiff arising out of its mortgage lien as of April 3, 2008 is $123,070.12.[1]  (Cote Cert. ¶ 17.)

---

[1] The Cote Certification explains Plaintiff's calculation of this figure in much greater detail than is set forth here.  No objection has been received to this calculation.

**B. Shamrock's Maritime Lien**

On September 22, 2004, the *Beth & Lisa* was at sea off the coast of New Jersey when it lost its prop or shaft and became disabled. (Docket Item 10 at ¶ 1.) The *Beth & Lisa* sent out a distress call, to which Shamrock responded by sending its vessel, the *Defiant*, to the *Beth & Lisa*'s location. (Id. at ¶ 2.) The *Defiant* "rendered . . . salvage services to the vessel," and, after consulting with the *Beth & Lisa*'s owner, towed the boat to Barney's Clam Dock in Atlantic City, New Jersey. (Id.) After the B&L was towed to the dock, Shamrock sent SCF an invoice for its services. (Def.'s Br. Ex. B.) SCF was billed $4,250.00 for Shamrock's services and, under the terms of the invoice, agreed to pay a 2% service charge on amounts that were more than thirty days overdue as well as attorney's fees incurred in efforts to collect unpaid funds. (Id.) In the section of the invoice describing the services Shamrock provided, the box marked "towing" was checked, and the box marked "salvage" was not. (Id.) On January 20, 2005, Shamrock filed a lien claim with the U.S. Coast Guard asserting that SCF had defaulted on its payments for salvage services. (Def.'s Br. Ex. A; Cattell Cert. ¶ 3.)

SCF sent payments of $500 on March 7, 2005 and May 6, 2005, but failed to make further any other payments on Shamrock's invoice. In October 2005, following SCF's failure to make further payments on the debt owed to Shamrock, Shamrock

4

instructed its attorneys to arrest and sell the *Beth & Lisa*. (Cattell Cert. ¶ 8.)  Shamrock's attorney, Mr. Cattell, met with Fradell and Lisa McCollough – the owners of the *Beth & Lisa* and SCF – on October 14, 2005, and at the meeting, the McColloughs expressed interest in being represented by Mr. Cattell's law firm in resolving various financial obligations, including the mortgage on the *Beth & Lisa* and the debt owed to Shamrock.  (Id. at ¶ 9.)  The law firm, intent on continuing to represent Shamrock as well as taking on the representation of SCF, proposed to resolve the conflict of interest by "assist[ing] South Coast by encouraging Bank of America, which [at the time] held the preferred ship mortgage on the Vessel, to foreclose."  (Id. at ¶ 11.)

Under the arrangement between Shamrock and SCF brokered by Mr. Cattell's firm, Shamrock agreed not to arrest and sell the *Beth & Lisa* with the understanding that after Bank of America instituted foreclosure proceedings, it would assert its claim as a salvor to recover unpaid funds.  (Cattell Cert. Ex. D.) According to Mr. Cattell, "[i]n reliance upon . . . [this] agreement of South Coast to pay Shamrock Marine from the proceeds of a mortgage foreclosure action, Shamrock Marine took no action to arrest the vessel or enforce its salvage lien."  (Cattell Cert. ¶ 14.)  The law firm terminated its representation of SCF on September 6, 2006, and Shamrock did not subsequently seek to

arrest and sell the *Beth & Lisa*. (Id. at ¶ 15.) Importantly, there is no evidence that Bank of America or Summit Bank, the holder of the Preferred Ship Mortgage on the *Beth & Lisa*, participated in any agreement to afford priority to Shamrock's salvage lien claim. Indeed, if anything, the bank indicated that it was not foreclosing upon its mortgage lien in 2006, according to Mr. Cattell, thus, by implication, leaving Shamrock to its own remedies upon Shamrock's salvage lien claim.

### C. Other Liens

Three other parties have filed lien claim certifications asserting claims against the *Beth & Lisa*. On August 12, 2005, Sea Gear Marine Supply, Inc. ("Sea Gear") filed with the NVDC a lien against the *Beth & Lisa* for "default on payment for supplies and services" in the amount of $3,251.46. (Docket Item 12.) Harbor Hydraulics & Machine, Inc. ("HHM")[2] has filed a document purporting to assert a lien in the amount of $1,379.72 against the *Beth & Lisa*, although apart from the certification filed with the Court, there is no evidence of the lien or its filing and recording history. (Docket Item 13.) Finally, Paul Lemieux asserts a lien claim for nonpayment for welding services in the amount of $16,854.84. (Docket Item 14.) Mr. Lemieux originally recorded his lien with the NVDC on or about December 8, 2004. (Id.)

---

[2] HHM does not appear to be represented by counsel.

**D.    Procedural History**

Plaintiff commenced this action on October 9, 2007 [Docket Item 1].  Two days later, Plaintiff filed a motion to appoint a custodian for the *Beth & Lisa* [Docket Item 2], which the Court granted on October 15, 2007 [Docket Item 5].  A warrant to arrest the vessel was issued on October 16, 2007 [Docket Item 6]. Plaintiff subsequently filed a motion for an order setting the date of sale of the *Beth & Lisa*, as well as a motion for default and final judgment, which Defendant has opposed based on its claim that it held a salvage lien on the *Beth & Lisa* that was entitled to higher priority than Plaintiff's mortgage lien.  On March 11, 2008, the Court ordered the United States Marshal to set and publish the date of sale for the *Beth & Lisa* and scheduled a confirmation hearing for the sale.  On April 4, 2008, the U.S. Marshal conducted a sale of the *Beth & Lisa*, which ultimately sold for $67,500.00.

**III. DISCUSSION**

**A.    Preferred Mortgage Liens and Salvage Liens**

The relative priorities of the parties' liens against the proceeds from the *Beth & Lisa* sale are governed by the Ship Mortgage Act of 1920 (codified at 46 U.S.C. §§ 30101, et seq.). As the Court of Appeals for the First Circuit has explained,

> Congress passed the Act in order to provide greater protection to private investment in the shipping industry.  Prior to the Act's passage, a mortgage on a

7

> ship was outranked in admiralty proceedings by ordinary maritime liens on the ship, even those arising after the mortgage. The Act changed the law by granting the holders of preferred ship mortgages "priority over all claims against the vessel (except for expenses and fees allowed by the court, costs imposed by the court, and preferred maritime liens)." 46 U.S.C. § 31326(b)(1) . . .

Faneuil Advisors, Inc. v. O/S Sea Hawk, 50 F.3d 88, 92 (1st Cir. 1995) (some internal citations omitted). Of the six categories of preferred maritime liens, only one is relevant to this matter: under the Act, a lien on a vessel "for salvage, including contract salvage," is a preferred maritime lien. 46 U.S.C. § 31301(5)(F). By contrast, liens arising from the provision of "necessaries," including "repairs, supplies[ and] towage[,]" § 31301(4), are not preferred maritime liens – they are accorded lower priority than preferred maritime liens under the Act. Critical, therefore, to the relative priority of ACF's and Shamrock's liens on the proceeds from the *Beth & Lisa* sale is the question of whether the services provided by Shamrock on September 22, 2004 constituted salvage or towage.

"To establish a salvage claim, [a party] must prove three elements: 1. A marine peril.  2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or service contributing to such success." Clifford v. M/V Islander, 751 F.2d 1, 5 (1st Cir. 1984) (quoting The Sabine, 101 U.S. 384, 384 (1879)); see also The Viola, 55 F. 829, 832 (3d Cir. 1893). The first prong –

marine peril – requires a showing that the service rendered was "designed to relieve [a vessel] from distress or danger either present or to be reasonably apprehended." The Neshaminy, 228 F. 285, 288 (3d Cir. 1915); see also Faneuil, 50 F.3d at 92 (marine peril "occurs when a vessel is exposed to any actual or apprehended danger which might result in her destruction") (citation omitted). The threat need not be "immediate and absolute," id. (citation omitted), and "[t]he degree of danger is immaterial in considering the nature of the service." Neshaminy, 228 F. at 288. "A situation of actual apprehension, though not of actual danger, is sufficient." Clifford v. M/V Islander, 751 F.2d 1, 6 (1st Cir. 1984) (citation omitted).

As to the voluntariness prong, "the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage." The Camanche, 75 U.S. 448, 477 (1869); see also Flagship Marine Services, Inc. v. Belcher Towing Co., 966 F.2d 602, 605 (11th Cir. 1992) (same). In addition, "[t]he fact that a shipowner requests a salvage service and that the salvors in response furnish it, standing alone, does not create an implied contract so as to defeat a salvage claim." Flagship Marine Services, 966 F.2d at 605 (quoting Fort Myers Shell & Dredging Co. v. Barge NBC 512, 404

F.2d 137, 139 (5th Cir. 1968)).

     1.  <u>Parties' Arguments</u>

Shamrock, which bears the burden in establishing its lien priority in this case, argues that the services it provided constituted salvage, not towage.  On September 22, 2004, Shamrock argues, the *Beth & Lisa* evidenced its apprehension of peril by sending out a distress call after it became disabled.  According to Shamrock, rendering services to an immobilized and disabled vessel constitutes salvage, not towage.  <u>See</u>, <u>e.g.</u>, <u>Evanow v. M/V Neptune</u>, 1999 AMC 516, 522 (9th Cir. 1999).  While the invoice Shamrock sent to SCF for the services it provided described the services as towage, Shamrock argues that courts look to the "character of the service rendered," not the label the parties use in describing such services, to "determine[] whether a contract is one for salvage."  <u>Id.</u> at 521; <u>see also</u> <u>Sears v. S.S. American Producer</u>, 1972 AMC 1647 (N.D. Cal. 1972).  In this case, Shamrock argues, it was not "called . . . by a sound vessel as a mere means of saving time, or from considerations of convenience," which would constitute towage, <u>Evanow</u>, 1999 AMC at 521, but was instead summoned by an immobilized vessel in distress, which means that it acted as a salvor.

ACF argues that the services Shamrock provided were neither voluntary nor rendered to a vessel in marine peril.  As to the voluntariness issue, ACF argues that the invoice submitted as

10

evidence in support of Shamrock's salvage claim indicates that Shamrock performed its services as part of a negotiated agreement, meaning that its services were not voluntarily rendered independently of existing agreements. Although it concedes that the invoice was created after Shamrock provided the services in question, ACF argues that this "does not make it any less a negotiated agreement." (Pl.'s Reply Br. 4.) ACF further argues that the B&L was not in marine peril when Shamrock provided its towing services. ACF draws the Court's attention to the reasoning in Faneuil that in order to constitute maritime peril,

> the threat must be something more than the inevitable deterioration that any vessel left untended would suffer; otherwise ordinary maintenance, repairs and storage - i.e., "necessaries" - could easily give rise to salvage liens if a vessel's owner were particularly negligent in caring for his or her boat.

Faneuil, 50 F.3d at 93. In this case, ACF argues, the *Beth & Lisa* was not taking on water, had not run aground, and was not at risk of sinking, and was, as such, not in peril at the time Shamrock rendered its services.[3]

    2. Analysis

The Court finds that Shamrock rendered salvage services to the *Beth & Lisa*. First, the element of marine peril is satisfied

---

[3] ACF does not contest Shamrock's assertion that the third prong of the salvage inquiry – "success in whole or in part" – is met in this case. Sabine, 101 U.S. at 384.

11

in this case. As the cases cited above indicate, a vessel need not face immediate, actual peril in order for a party to make out a salvage claim. "A situation of actual apprehension, though not of actual danger, is sufficient." Clifford, 751 F.2d at 6; see also Neshaminy, 228 F. at 288 ("distress or danger either present or to be reasonably apprehended" sufficient to show marine peril). Courts in this district and in others have held that a vessel that is disabled and at sea is in a state of marine peril, even if it is not taking on water or exposed to an immediate risk of sinking. See, e.g., Squires v. The Ionian Leader, 100 F. Supp. 829, 834 (D.N.J. 1951) ("It is conceded that The Leader was in no immediate danger, but it is obvious that the loss of her propeller exposed her to the perils of the sea"); Markakis v. S/S Volendam, 486 F. Supp. 1103, 1107 (S.D.N.Y. 1980) ("Just as a stranded ship is imperiled, so too, one adrift without power may be equally endangered"). Here, the *Beth & Lisa* was disabled as a result of its missing prop or shaft. While it did not face actual, impending danger when it sent out its distress call, the very fact that the *Beth & Lisa* issued such a call is strong evidence that its crew had an "actual apprehension" of peril as a result of its immobilization. Clifford, 751 F.2d at 6; see also The Adelaide T. Carleton, 215 F. 932, 934-35 (D. Conn. 1914) ("It seems to me that Captain Kent must have realized that he was in some kind of danger, and, although that danger was not

12

imminent, yet it was sufficient to produce the belief in his mind that he needed assistance, and needed it enough to order a signal of distress to be attached to the topmost part of the rigging").

Faneuil, relied upon by ACF, is not to the contrary. In Fanueil, the vessel in question was not adrift at sea, but, rather, was "in the safe custody of a state officer with statutory authority to provide for its safekeeping." 50 F.3d at 93. The language in that case cited by ACF – that "the threat must be something more than the inevitable deterioration that any vessel left untended would suffer," id. – is simply not applicable to the facts of this case. The danger that was the subject of the *Beth & Lisa*'s distress call manifestly was not simply the vessel's "inevitable deterioration." Instead, the danger that prompted the *Beth & Lisa* to signal its distress was, obviously, the fact that it had become disabled and was adrift at sea. Such apprehension of danger is sufficient to constitute marine peril. Squires, 100 F. Supp. at 834.

ACF's argument that Shamrock provided its services pursuant to a negotiated agreement, and therefore not voluntarily, is without merit. Nothing in the record suggests that ACF and Shamrock had a preexisting arrangement prior to the *Beth & Lisa*'s emergency. Further, there is no evidence that the parties agreed upon a price for Shamrock's services prior to the aid being rendered and regardless of success or failure. Moreover, "[t]he

13

fact that a shipowner requests a salvage service and that the salvors in response furnish it, standing alone, does not create an implied contract so as to defeat a salvage claim." Flagship Marine Services, 966 F.2d at 605 (citation omitted). Shamrock simply was under no preexisting obligation to respond to the *Beth & Lisa*'s distress call, meaning that the services it rendered to the vessel were voluntary and properly the subject of a salvage claim.

Because the *Beth & Lisa* was in a state of marine peril when Shamrock voluntarily and successfully rendered the services in question, it is apparent that Shamrock's services constituted salvage, not towage.

**B.   Statute of Limitations**

ACF argues that Shamrock's salvage claim is barred by the statute of limitations for salvage claims. ACF relies upon 46 U.S.C. § 80107, which provides that:

> A civil action to recover remuneration for giving aid or salvage services must be brought within 2 years after the date the aid or salvage services were given, unless the court in which the action is brought is satisfied that during that 2-year period there had not been a reasonable opportunity to seize the aided or salvaged vessel within the jurisdiction of the court or within the territorial waters of the country of the plaintiff's residence or principal place of business.

46 U.S.C. § 80107. According to ACF, since the act of salvage occurred on September 22, 2004, Shamrock was required to bring an action on its claim by September 22, 2006.

14

Shamrock does not dispute ACF's argument that the statute of limitations contained in § 80107 applies to this matter, and does not claim that it filed suit to recover on its lien within the applicable limitations period, but argues instead that the statute of limitations period should be tolled.  According to Shamrock, courts have tolled § 80107's two-year statute of limitations "where the parties have reached an agreement as to the manner of payment."  (Shamrock Opp'n Br. 11.)  In support of this argument, Shamrock draws the Court's attention to Jackson v. Costa Lines, Inc., 490 F. Supp. 393 (S.D. Fl. 1980).  In Jackson, the plaintiff, who performed salvage services for the defendant, reached an oral agreement with the defendant that in lieu of monetary remuneration for the salvage, the plaintiff would accept a lifetime of free cruises aboard the defendant's vessels.  490 F. Supp. at 396.  Four years after this agreement was reached, Plaintiff requested that its terms be memorialized in writing, and defendant refused.  Id.  The court held that

> the conduct of the defendants in extending cruises in accordance with some agreement with the Captain resulted in a tolling of the statute of limitations until such time as it became reasonably apparent to plaintiff that defendants would not adhere to the terms that plaintiff believed to be their agreement.

Id. at 397; see also Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, 614 F.2d 1051 (5th Cir. 1980); Metropolitan Dade County v. One (1) Bronze Cannon, 537 F. Supp. 923 (S.D. Fl. 1982).

15

The circumstances do not warrant tolling the statute of limitations period in this case. While it is true that courts have occasionally held that the statute of limitations for salvage actions can be equitably tolled as a result of the conduct of the parties, these cases "involved agreements that were later dishonored." Michigan Marine Salvage and Services, Inc. v. McKeil Marine Ltd., No. 06-13525, 2007 WL 1585601, at *4 (E.D. Mich. May 31, 2007) (declining to toll statute of limitations in the absence of a dishonored agreement), or at least some conduct by the opponent that would render enforcement of the limitation period to be inequitable.

First and foremost, neither ACF nor its predecessor banks entered any specific or implied agreement to recognize Shamrock's salvage lien or to enlarge the limitations period. No conduct by ACF or its predecessors tolls the limitations period.

Second, SCF did not induce Shamrock into entering an agreement as to the manner of payment for the salvage services on which SCF later reneged. Rather, to the extent that the evidence discloses any agreement between SCF and Shamrock, it indicates that Shamrock forwent filing a timely salvage suit in order to permit its attorney to represent both it and SCF – as ACF argues, the benefits of this arrangement appear to have inured to SCF and Shamrock's attorney, but not to Shamrock itself. Shamrock did not, as its counsel certifies, fail to assert its salvage claim

16

"[i]n reliance upon . . . [an] agreement of South Coast to pay Shamrock Marine from the proceeds of a mortgage foreclosure action," (Cattell Cert. ¶ 14), since SCF was no more in a position to control the proceeds of a foreclosure action against the *Beth & Lisa* during the pendency of the statute of limitations than it is now.

In a similar vein, where courts have equitably tolled § 80107's statute of limitations, they almost universally note that such tolling is only appropriate upon a showing of "proper diligence on the part of the plaintiff which such statutes of limitation were intended to insure." Platoro, 614 F.2d at 1054 (quoting Goldlawr, Inc. v. Heiman, 369 U.S. 463, 467 (1962)); see also Jackson, 490 F. Supp. at 397. No such showing has been made here. Relying on a promise of SCF to pay Shamrock in funds that were not SCF's to commit hardly rises to the level of diligence exhibited and recognized by the courts in cases like Platoro and Jackson.

Third, ACF, in the absence of some agreement to the contrary by its predecessor banks, could reasonably rely upon the passage of the two-year limitation period precluding Shamrock's lien claim before ACF even took the assignment in 2007.

For the reasons explained above, the Court finds that Shamrock failed to assert its claim within the applicable statutory period, and that Shamrock has failed to establish that

17

the statute of limitations should be tolled.[4]

### III. CONCLUSION

Although Shamrock performed salvage services for the *Beth & Lisa*, it does not hold a lien entitled to higher priority than ACF's, since it did not pursue its claim within § 80107's two-year statute of limitations.  An appropriate Order will be entered confirming the sale of the *F/V Beth & Lisa* and according first priority to the Plaintiff's lien, after payment of the allowable costs and fees of arrest, storage and sale of the vessel.


**April 29, 2008**                              **s/ Jerome B. Simandle**
Date                                             JEROME B. SIMANDLE
                                                 United States District Judge

---

[4]  ACF briefly argues that Shamrock's claim should be denied under the doctrine of unclean hands.  The Court need not reach this argument, since it finds Shamrock's claim to be time-barred.  Additionally, the parties advance arguments as to whether the Court should award Shamrock attorney's fees for seeking to enforce its lien rights.  The Court denies Shamrock's request.  "As a general matter, attorneys' fees are not available in admiralty cases unless the court determines in its equitable discretion that one party has acted in bad faith."  Sosebee v. Rath, 893 F.2d 54, 56 (3d Cir. 1990).  No showing of bad faith on ACF's part has been made here.  Shamrock's claim for attorney's fees should be brought against SCF – the party to the contract it purports to enforce – not in this in rem action against the *Beth & Lisa*.  Offshore Marine Towing, Inc. v. MR23, 412 F.3d 1254, 1258 (11th Cir. 2005).